

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES,<br>an Illinois corporation,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER INTERNATIONAL, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Judge Ronald A. Guzmán

No. 01 C 4809

## MEMORANDUM OPINION AND ORDER

In this case, Abbott Laboratories ("Abbott") sought confirmation of an arbitration award

that barred Baxter International, Inc. ("Baxter") from marketing generic sevoflurane for a certain

length of time. The Court granted the motion, and the Seventh Circuit affirmed the ruling.

Subsequently, Abbott learned that Baxter was engaging in activity that Abbott believed violated

the arbitration award and this Court's order. Abbott moved to find Baxter in contempt for

violating this Court's order, and the Court referred the motion to Magistrate Judge Martin

Ashman. Before the Court is Abbott's objection to Magistrate Judge Ashman's Report and

Recommendation ("R&R") in which he recommended that the Court deny Abbott's motion. For

the reasons provided in this Memorandum Opinion and Order, the Court adopts the Report and

Recommendation in full and denies Abbott's motion for contempt.

## Facts

In the mid-1960s, Baxter scientists developed sevoflurane, a fluorine-based inhalation

anesthetic. *Abbott Labs. v. Baxter Int'l, Inc.*, Nos. 01 C 4809, 01 C 4839, 2002 WL 467147, at

*1 (N.D. Ill. Mar. 27, 2002), *aff'd, Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 833 (7th Cir. 2003). During the 1980s, Baxter decided to license its rights to market sevoflurane, rather than market it directly. *Id.* Baxter gave Maruishi, a Japanese pharmaceutical company, the option to license, on an exclusive basis, Baxter's sevoflurane patents in Japan, Korea, the Philippines and Taiwan. *Id.* In 1988, Baxter and Maruishi expanded their agreement when Baxter gave Maruishi the option to acquire worldwide rights to all of Baxter's then-existing sevoflurane patents. *Id.*

Maruishi and Abbott then began discussing a possible arrangement in which Abbott would market sevoflurane in places where Maruishi did not do business. *Id.* Maruishi began negotiations with Baxter and Abbott to develop a new agreement that would enable Maruishi to sell sevoflurane to Abbott for resale around the world. *Id.*

On September 3, 1992, Baxter and Maruishi signed a Patent and Know-How License Agreement ("Baxter-Maruishi Agreement"). *Id.* In pertinent part, the Baxter-Maruishi Agreement granted Maruishi an exclusive license, to make, use, have and sell sevoflurane throughout the "Territory," which comprised the world except Japan, North and South Korea, and the People's Republic of China exclusive of Hong Kong. *Id.* The Baxter-Maruishi Agreement also granted Maruishi an exclusive license to make sevoflurane in Japan, and to sublicense Central Glass to make sevoflurane in Japan, for sale exclusively to Maruishi in Japan. *Id.* Baxter also granted Maruishi the exclusive rights to resell the products to Abbott in Japan, for resale by Abbott throughout the Territory. *Id.*

In addition to setting forth a methodology for determining royalty payments, the Baxter-Maruishi Agreement contemplated other agreements between Maruishi, Abbott, Baxter and

2

Central Glass. *Id.* at \*2. Ultimately, however, the Baxter-Maruishi Agreement contained "an exclusive, non transferable license in the Territory . . . to sell sevoflurane." *Id.* Under the agreements, Abbott was the party with the ultimate responsibility for the commercial marketing and distribution of sevoflurane in the Territory. *Id.* The parties entered into a dispute resolution agreement on September 4, 1992, which contained a detailed provision relating to the resolution of any disputes arising from the sevoflurane agreements between the parties. *Id.*

In 1998, Baxter acquired the Pharmaceutical Products Division of the Ohmeda health care business of the British Oxygen Company ("BOC") Group. *Id.* at \*4. Ohmeda had developed another process for making sevoflurane known as the three-step process, and Ohmeda was Abbott's principal competitor in the sale of inhaled anesthetics in the U.S. *Id.* After acquiring Ohmeda, Baxter proceeded with Ohmeda's plan to introduce generic sevoflurane in the U.S. using the three-step process. *Id.*

After learning of Baxter's plan to introduce generic sevoflurane, Abbott claimed that Baxter would violate the Baxter-Maruishi Agreement if it sold generic sevoflurane before the December 2005 expiration of the sublicense agreement. *Id.* On May 25, 2000, pursuant to the dispute resolution agreement, Abbott demanded binding arbitration of its claim. *Id.*

On June 15, 2001, the arbitration panel ("the Tribunal") ruled in favor of Abbott and ordered Baxter not to "market, whether directly or indirectly," generic sevoflurane prior to the December 11, 2005 expiration of the sublicensing agreement. (Pl.'s Objections R&R, Ex. C, Final Award 20.) This ruling ("the Tribunal Award") was confirmed by this Court and affirmed by the Seventh Circuit Court of Appeals. *See Baxter Int'l,* 315 F.3d at 833; *Abbott Labs,* 2002 WL 467147, at \*13.

3

Subsequently, Abbott moved to hold Baxter in contempt, claiming that Baxter was marketing generic sevoflurane in violation of the Tribunal Award and this Court's order confirming that award. The Court referred the motion to Magistrate Judge Ashman. Abbott argued that Baxter violated the Tribunal Award by: (1) entering into at least four contracts with group purchasing organizations ("GPOs"), for Baxter products, including generic sevoflurane; (2) entering into a contract with, and providing pricing information to, the GPO Purchasing Alliance for Clinical Therapies ("PACT") for sales after December 11, 2005; (3) conducting market research on the packaging of generic sevoflurane; (4) sending emails informing potential customers of Baxter's plans to resume selling generic sevoflurane in the near future and discouraging potential customers from signing long-term contracts with Abbott; and (5) sending emails to its salespeople encouraging them to keep track of Abbott's sales efforts and inform potential customers that Baxter's generic sevoflurane would be available in December 2005. (R&R 5.) Baxter did not deny that these activities occurred but argued that: (1) Abbott mischaracterized the activities; and (2) the activities do not constitute violations of the Tribunal Award because the Award only prevents Baxter from actually selling generic sevoflurane prior to December 11, 2005. (Id.)

Both parties argue that whether Baxter could be held in contempt hinges on how the Court defines "to market, either directly or indirectly," as set forth in the Tribunal Award. Abbott argues that the word "market" is unambiguous and should be construed broadly unless limited by contract. A broad definition of "market" would include sales, promotions, advertising, shipping, storing, and preparations for sale. Id. Baxter, however, argues that "market" should be construed by the Court as only providing a ban on actual sales. (Id.)

4

Further, Baxter asserted that its activities regarding sevoflurane did not constitute sales as prohibited by the Tribunal Award.

In his R&R, Magistrate Judge Ashman found that in the context of this case, the definition of "market" must be interpreted in light of the parties' dispute and the Tribunal's decision. The Tribunal Award (and this Court's order confirming the award) prohibited Baxter from selling generic sevoflurane, *i.e.*, transferring generic sevoflurane for a price, in the Territory prior to December 11, 2005. Magistrate Judge Ashman rejected a broad definition of the term and found that "to market" means "to sell." He further held that the activities engaged in by Baxter, such as the GPO and PACT contracts, market research, and emails to customers and employees, did not violate the Court's order that confirmed the Tribunal Award. Abbott objects to the R&R and argues that Magistrate Judge Ashman's ruling: (1) contradicted the plain language of the Tribunal Award by limiting its prohibition to only an actual, technical sale of sevoflurane by Baxter; (2) failed to properly consider the underlying dispute and the purpose of the arbitration; and (3) was based on an unfounded concern that Baxter have clear notice that its actions were in violation of this Court's order.

## Discussion

Under Federal Rule of Civil Procedure ("Rule") 72, the standard of review employed by a district court when reviewing matters determined by a magistrate differs based on whether the matter is dispositive or nondispositive. *See* FED. R. CIV. P. 72. Nondispositive matters are reviewed under the clearly erroneous standard, while dispositive matters are reviewed under the *de novo* standard. FED. R. CIV. P. 72(a), (b). District courts review a magistrate's ruling on a

5

motion for contempt under a *de novo* standard. *See, e.g., Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 349 F. Supp. 2d 509, 514-15 (E.D.N.Y. 2004) (stating that district court uses *de novo* standard in reviewing magistrate's ruling on motion for contempt); *Converse Inc. v. Reebok Int'l Ltd.*, 328 F. Supp. 2d 166, 168 (D. Mass. 2004) (same); *Advent Elecs., Inc. v. Buckman*, No. 95 C 305, 1996 WL 473658, at *1 (N.D. Ill. Aug. 12, 1996) (same). Under a *de novo* standard, the judge must "look at all the evidence contained in the record . . . and may accept, reject, or modify the recommended decision." *Harlyn Sales Corp. Profit Sharing Plan v. Inv. Portfolios-Gov't Plus Fund*, 142 F.R.D. 671, 674 (N.D. Ill. 1992), *aff'd*, 9 F.3d 1263, 1268 (7th Cir. 1993); *see* 28 U.S.C. § 636(b)(1)(c) (stating that a court is required to make a *de novo* determination as to those portions of the report and recommendation to which objections are made).

To prevail on a motion for civil contempt, a party must prove by "clear and convincing evidence" that the opposing party violated a court order. *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (quotation omitted). The district court "must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated." *Id.* (quotations omitted).

The decree at issue here is this Court's ruling confirming the Tribunal Award which stated that "Baxter International Inc. is hereby ordered not to market, whether directly or indirectly, the inhalation anaesthetic known as Sevoflurane in the Territory defined in the [Maruishi-Abbott Agreement] . . . until the expiration of that Agreement." (Pl.'s Objections R&R, Ex. C, Final Award 20.) The pivotal issue is the meaning of the phrase "to market."

For the reasons set forth herein, the Court finds that the Tribunal Award's prohibition of "marketing" constitutes only a ban on sales and Baxter's activities do not constitute prohibited sales under the terms of the Tribunal Award.

## A. "To Market, Whether Directly or Indirectly" Means to Sell

Abbott argues for an ordinary meaning construction of the word "market," which it argues includes sales, promotions, advertising, shipping, storing, and preparations for sale. Abbott asserts that a broad definition of "market" was both anticipated and intended by the Tribunal and this Court. (Pl.'s Objections R&R 3.) Further, Abbott contends the Tribunal Award was designed to be a broad covenant not to compete, prohibiting Baxter from competing or interfering with Abbott in the sevoflurane market in any way. *Id.*

Despite Abbott's assertions, the language of the Tribunal Award clearly reflects that the prohibition on "marketing" is limited solely to actual sales. Indeed, Abbott's own claims in the arbitration proceedings reflect this interpretation. In a pre-arbitration memorandum to the Tribunal, Abbott asserted "under the theory of promissory estoppel, Baxter cannot sell Sevoflurane during the contract term because of its repeated assurances that it would not do so," and "Baxter's sale of Sevoflurane would constitute unfair competition by its misuse of confidential and competitive information." (Pl.'s Objections R&R, Ex. C, Final Award 9.) Abbott also argued that Baxter should be estopped from "entering the Sevoflurane market." (*Id.*) While Abbott now argues that the Court should construe entering the market to mean activities other than only sales, nothing in the Tribunal Award points to such a broad interpretation.

7

Furthermore, other sections of the Tribunal Award show that the phrase "to market" means "to sell." For example, section VIII of the Tribunal Award references "sales" repeatedly but does not expand the term to cover any other types of "marketing." The Tribunal Award states: "Baxter's sales of a generic Sevoflurane product will reduce the amount a party would but for such change otherwise receive under any Sevoflurane Agreement." (*Id.* 15.) The Award further states that "Should Baxter re-enter the market with a generic Sevoflurane, Abbott's sales of Sevoflurane will be affected thereby adversely affecting the overall economic benefit . . . ." (*Id.*) Finally, the Award states that "Baxter should be enjoined from selling a generic Sevoflurane product." (*Id.*)

As such, the Tribunal Award clearly reflects that in this context, "to market" means "to sell." Expanding the definition of "to market" beyond its clearly evidenced meaning impermissibly expands the scope of the Tribunal's Award, beyond that intended by the Tribunal, and indeed by the parties themselves. Significantly, neither this Court nor the Seventh Circuit interpreted the Tribunal Award's language broadly when confirming the Award. *See Baxter Int'l*, 315 F.3d at 831; *Abbott Labs.*, 2002 WL 467147, at *7.

**B.    Baxter's Activities Did Not Constitute Prohibited "Sales"**

Abbott alleges that Baxter violated the Tribunal award by (1) entering into at least four contracts with GPOs for various Baxter products, including generic sevoflurane; (2) entering into a contract with, and providing pricing information to, the GPO PACT; (3) conducting market research on the packaging of generic sevoflurane; (4) sending emails to potential customers that discouraged them from signing contracts with Abbott and informed them that Baxter intended to

8

resume selling generic sevoflurane in the future; (5) sending emails to Baxter's sales force encouraging them to keep track of Abbott's sales efforts and to inform potential customers that Baxter's generic sevoflurane would be available in December 2005; and (6) conducting market research and activities, such as focus groups.

Having decided that "marketing" means "sales" in this context, the Court finds that none of Baxter's activities constituted prohibited sales. Rather, the alleged conduct was pre-sale activity, in anticipation of the December 2005 expiration of the sevoflurane agreement. For example, Baxter's GPO contracts explicitly listed Baxter's generic sevoflurane as having an anticipated launch date of December 2005, after the expiration of the sevoflurane agreements. While Abbott argues that the GPO contracts were prohibited "futures" agreements, they nonetheless do not allege that any actual "sales" took place. Because sales did not occur, the Court finds that the negotiation of the GPO agreements did not violate any court order.

Under the plain language of the Tribunal Award, Baxter was only prohibited from engaging in actual sales of sevoflurane before the expiration of the sevoflurane agreements. To interpret the phrase "to market" as a broad prohibition on all pre-sale activity would impermissibly contravene the intent of the Tribunal and have the effect of extending the date by which Baxter could feasibly enter the sevoflurane market beyond the December 2005 deadline.

## Conclusion

For the foregoing reasons, the Court adopts Magistrate Judge Martin Ashman's R&R in full and denies Abbott's motion for contempt [doc. nos. 40, 58, 81].

**SO ORDERED**                    **ENTERED:**    9/21/06

HON. RONALD A. GUZMAN
United States Judge